**BEST MOTOR AND IMPLEMENT COMPANY, Inc., Appellant,**

v.

**INTERNATIONAL HARVESTER COMPANY, Appellee.**

No. 16784.

United States Court of Appeals Fifth Circuit.

Jan. 30, 1958.

Rehearing Denied March 5, 1958.

Francis S. Bowling, Jackson, Miss., Crisler, Crisler & Bowling, Jackson, Miss., of counsel, for appellant.

Stokes V. Robertson, Jackson, Miss., Edward J. Currie, Hattiesburg, Miss., Edward J. Currie, Jr., Robertson & Cruthirds, Jackson, Miss., of counsel, for appellee.

Before RIVES, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The question here is whether the Trial Court properly directed a verdict for the Manufacturer in the Dealer's suit for damages flowing from an asserted illegal cancellation of dealership contracts and a trespass committed in the course of cancellation. The cancellation issue presents for possible application Louisiana's "fair deal" dealership act[1] and the tres-

---

1. LSA–R.S. §§ 32:1254–32.1257. § 1254 provides:

"A. It shall be unlawful and constitute a misdemeanor:

    \*     \*     \*     \*     \*

"4. For a manufacturer of motor vehicles, a distributor, a wholesaler, dis-tributor branch or factory branch, or officer, agent or other representative thereof: \* \* \*

"(c) To unfairly, without due regard to the equities of said dealer and without just provocation, cancel the franchise of any motor vehicle dealer. The non-

pass claim concerns a possible illegal repossession or possession of some trucks for a few days.

Best Motor & Implement Company, the Dealer, had a short, but not quiet, business life at Kentwood, Louisiana. A Louisiana corporation, it came into being about January 1, 1954, when its stockholders, McClaren, Sr., Batrous, and Best, just recently an employee of International Harvester Company, through capital contributions of $5,000 each plus the proceeds of a $5,000 bank loan by the Corporation, bought out the business of the former dealer for $20,000. The first year's operation, under the dominant management of Best, was far from satisfactory with an actual undisputed loss in excess of $8,000. Batrous and McClaren had decided not to put any more money into the business, and at least Batrous thought either he or Best should get out. From these negotiations on a proposed buy-or-sell basis, Batrous, on December 22, 1954, bought out Best's stock ownership for $3,000 plus a release of any liability which Best might have to the bank or others. Subsequently McClaren took half of this off Batrous's hands. Batrous, a local successful enterpriser in bottling, farming, and other local business, assumed management direction until in February 1955 when young McClaren, a short-time employee of Harvester, was made general manager. McClaren, Sr. was a practicing lawyer at McComb, Mississippi, but for fourteen years prior to 1943, he, too, had been an employee of Harvester.

The purchase on December 22, 1954, of Best's interests by Batrous and McClaren, Sr. is of great interest in this litigation. But whether it is of more than interest is at best obscure. Indeed, one of the things which undoubtedly led the Trial Judge, who, by running inquiries from the bench and rulings on evidence or other motions groped for days to find out what the case was about, finally to direct a verdict, was the inability of the Dealer to indicate what its claim really was, or how, or in what manner it suffered damage.

On the pleadings, both initial and the final amendment made after extensive pretrial depositions and discovery, the Dealer claimed positively that as a condition to the others buying out Best on December 22, 1954, Harvester agreed in a New Orleans meeting of January 3, 1955, to extend the maturity date of unidentified notes for equipment purchased by the Dealer under floor plan financing, but that contrary to the promise had not done so with the result that timely payments had stripped the Dealer of current assets. But this claim did not last very long. It couldn't. For it was undisputed that Best was bought out on December 22, 1954, nearly two weeks before the time the claimed inducement promise was made.

Of course, that didn't end the matter for the evidence, admitted under circumstances of an implied consent, Fed.Rules Civ.Proc. rule 15(b), 28 U.S.C.A. initially indicated another claim—a sort of variation in a minor key on the dominant theme above. It, too, started with the December 22, 1954, purchase. But no longer was the promise to extend maturity the inducement for that purchase. The Dealer's evidence, from the McClarens and Batrous, now showed that it was the inducement for McClaren, Sr. and Batrous advancing to the Corporation on its note to them another $14,000 during 1955, and the execution on January 3, 1955, of a personal guaranty to Harvester and its financing affiliate, International Harvester Credit Corporation. While Harvester's evidence refuted any such agreement other than for the possible limited extension of notes covering four tractors, we must, as did the Trial Court, assume that the agreement, vague as it was, to extend maturities was made as claimed. The Dealer's evidence then, in an even more

renewal of a franchise or selling agreement without just provocation or cause shall be deemed an evasion of this paragraph and shall constitute an unfair cancellation, regardless of the terms or provisions of such franchise or selling agreement."

vague sort of way, went the next step to show that within a month Harvester breached this agreement by demanding timely payment. And as the last step, but now more vague than the other two, the Dealer urged the inference that Harvester's insistence on its pound of flesh from the letter of the bond, so stripped the Dealer of its liquid assets, that when the catastrophic events of May 24–31, 1955, took place, its cash was so depleted that it could not avoid giving the two no-fund checks and misapplying the floor plan trust funds which brought down the wrath of Harvester.

The trouble was, the Dealer made it clear that all of this was but background color, and the suit was not for the breach of this January 3, 1955, agreement to extend maturities. This it has reiterated here in unmistakable terms.[2]

That left then only the events transpiring in the fateful week May 24–31, 1955, including the actual cancellation of the dealership contracts on May 31, 1955.

We compress the contention reflected by this thousand-page record, which we have carefully read, by stating at the outset that the evidence would allow but one conclusion that the cancellation of the contracts was effectuated May 31, 1955, in a lawful manner and for good cause. In reaching this conclusion, we may assume the applicability of the Louisiana Dealer Act, note 1, supra, notwithstanding the substantial questions[3] which might exist as to its validity. For as we view it, reasonable minds on this record could not have concluded that Harvester acted " * * * unfairly, without due regard to the equities of said dealer and without just provocation * * *." Indeed, the action was fair, properly regarded the equities of the Dealer, and had ample provocation.

On May 17, Harvester sent a credit man from New Orleans to confer with the Dealer. The Dealer was then in arrears on the April open account for parts due May 1. Harvester was also concerned about the Dealer's general stability in view of difficulties the Dealer was then having with the Chrysler Corporation and Commercial Credit Corporation which handled the Dealer's floor plan financing of Chrysler-Plymouth automobiles. There was substantial basis for some anxiety on this score.[4] In making the inventory check, a question arose about accounting for two trucks which McClaren, Jr. advised the credit representative were en route from the factory.

2. " * * * we * * * point out that while we do not base our case on the conference of January 3, 1955, we contend that it is very important in considering the matters that occurred the last week in May. The appellant's testimony is clear that appellee made no effort to live up to its promises of January 3, 1955 to extend the outstanding obligations. In fact, after this attitude on the part of appellee was learned by appellant's owners they registered no serious objections, but went ahead and paid all obligations as they became due and every obligation was kept current until the incidents of May, even though appellant could and probably should have held appellee to its promises of January 3, 1955."

3. The Louisiana statute was enacted July 7, 1954, but not effective until January 1955. The contracts here were executed January 18, 1954. Whether it may apply to regulate cancellation of a pre-statute contract or otherwise impairs the obligations of contracts, denies the liberty to contract are, with others, some of the constitutional problems dealt with as legislation of this same character has been upheld by some courts, Kuhl Motor Co. v. Ford Motor Co., 270 Wis. 488, 71 N.W. 2d 420, 55 A.L.R.2d 467; Willys Motors, Inc. v. Northwest Kaiser-Willys, Inc., D.C.Minn., 142 F.Supp. 469; cf. Buggs v. Ford Motor Co., 7 Cir., 113 F.2d 618, while stricken down by at least one court as unconstitutional, General Motors Corp. v. Blevins, D.C.Colo., 144 F.Supp. 381, 3-judge court.

As a matter of interest, see the recent Federal legislation in this field, 15 U.S. C.A. § 1221 et seq.

4. About this time the Chrysler dealership was cancelled, and by mutual consent, Chrysler took back the entire stock of new automobiles. Chrysler, or the finance company, subsequently sued Batrous and McClaren, Sr. on their personal guaranty which resulted in the payment by them of substantially $6,000.

In the May 17 conferences, McClaren, Jr. promised to pay the open account immediately, and he either gave or sent two checks totaling $941.26. Within a few days, these two checks were returned unpaid by the drawee bank because of insufficient funds. Through reports routinely made by the Dealer and others, it was also learned about this time that of the two trucks not satisfactorily accounted for, one had actually been sold by the Dealer to Sheen in New Orleans on about April 20, 1955. The amount received for it was approximately $1200. The dealership contract provided that the proceeds received by the dealer on the sale of a truck or other equipment under Harvester's floor plan financing "shall be considered the property of the Company in lieu of the goods so sold and shall be held in trust for it and subject to its order."

In the atmosphere created by the reports of the Chrysler dealership difficulties, Harvester on May 24 then sent its district zone truck manager, F. M. Smart, to Kentwood. We have to assume from the conflict in the evidence that his personal mannerisms were rude, overbearing, ugly and peremptory and were characterized by McClaren, Jr. as "belligerent," although he soon indicated that the word was colloquially used since there was never any showing of physical violence or that it could have had any effect on young McClaren, an ex football player and marine.

Whatever the personal behavior of Smart, he soon verified from McClaren, Jr. that the Sheen truck sale proceeds had not been remitted, nor had they been held as trust funds. Smart, on orders from his superiors to stay there to protect the interests of the Company, relayed their demands that these three items be taken care of immediately. In the meantime McClaren, Jr. left some time later on May 24 on a personal trip to New Orleans. He did not return until late Wednesday afternoon, May 25. He knew that Smart would be around the Dealer's place of business. Of course neither McClaren, Sr. nor Batrous was on the premises. Sometime on Thursday, May 26, Smart asked Varnado, then in charge of the Dealer's place of business in young McClaren's absence, where the keys were to the new trucks parked on the adjacent sales lot. Varnado merely stated, "I don't have them" and Smart then "understood him to say they were in the office." Without objection from Varnado, Smart then opened up a desk drawer, rummaged through the papers, came up with the keys, and then went out on the lot and started each of the trucks.[5] He subsequently locked the trucks and kept the keys in his possession until he returned them to the Dealer on June 1. Sometime Thursday, May 26, McClaren, Jr. was going to demonstrate a truck and on looking in his desk drawer found the keys missing. Smart, who was on the premises, acknowledged that he had them.[6]

As McClaren, Jr. in the interim of May 24–26, had several times acknowledged that the Dealer could not take up the two no-fund checks and remit the trust funds, a conference was arranged for Friday, May 27. This was attended

5. There were apparently seven trucks under floor plan notes totaling $14,790.87. The farm equipment, tractors, etc. in no way affected by taking the keys to the motor trucks, were under floor plan notes totaling $22,009.72. In addition there was refrigeration equipment under floor plan notes totaling $769.50.

Of these floor plan notes, approximately $3700 was past due, see note 7, infra.

6. McClaren, Jr. testified: " * * * I called him [Smart] into the office and I asked him if he had the keys, and he produces them out of his pocket and I said, 'Well, did you go in that desk drawer right over there and get them?' and he said, 'Yes, sir.' I said 'Nobody gave you permission to get them?' and he said, 'No, sir' and he stuck them back in his pocket?

"Q. Did he at any time ever offer you the keys back? A. No, sir.

"Q. How long did Mr. Smart keep the keys to the trucks that were on display there at the place of business? A. He brought the keys back Wednesday, * * * I mean June the 1st, '55. It was six days."

by both of the McClarens for the Dealer and several district representatives of Harvester who made a special trip from New Orleans for that purpose. These discussions were carried on without acrimony or bitterness or strife. The question of the truck keys was not mentioned. The meeting was in all respects a businesslike affair concerned with the serious problem of the Dealer's current finances. McClaren, Sr. announced that he was not going to advance any more funds, but both he and his son stated that if the maturities [7] on floor plan merchandise were extended, the Dealer could carry on successfully. Equally undisputed is the fact that Harvester's representatives stated that it was absolutely essential that the two bad checks and the trust funds be made good immediately, and that if that were done, Harvester would work with the Dealer on these other matters. Harvester was insisting on immediate payment of these three items and conditioned all other future actions on it.

Since his father was no longer a source for the needed capital, young McClaren stated that he thought he could perhaps raise $3,000 from other sources, but that it might take several days to do so. Consequently, that meeting adjourned with McClaren, Jr. stating that he would call the district manager on Monday, May 30. So cordial was this meeting that McClaren, Jr., on his inquiry, was invited to ride to New Orleans with the Harvester's manager who incidentally treated him to lunch. In New Orleans they parted on a first-name basis with McClaren, Jr. repeating that he would call on Monday.

Came Monday, May 30, and no call. Inquiry developed that young McClaren's hopes were unfounded. The managers then set out from New Orleans to see Batrous and McClaren, Sr. As each was out of pocket on the 30th, they did not see McClaren, Sr. until early the next morning, Tuesday, May 31, on the streets of McComb, Mississippi. At his invitation, they proceeded to his nearby law offices where it was confirmed that there was no new cash, and hence the three items could not be taken care of. Harvester's representative asked McClaren, Sr. what could be done and whether he would surrender possession of the floor plan merchandise. To this, whether as stockholder, officer, or as lawyer, or all three, he announced that Harvester knew its rights under the contracts, and it was now up to them to do what they could. With the gage thus down, Harvester's district manager then and there cancelled each of the contracts and this was confirmed by letters of the same date, May 31, 1955, dispatched from New Orleans two days later.

The immediate termination of the contracts under this situation was justified as a matter of contract[8] provision and as a matter of business prudence and morals. Murmanill Corp. v. Simkins, 5 Cir., 251 F.2d 33.

■ As these contracts reflect, a manufacturer with a nationwide distribution of its products has a continuing interest in the manner its dealers carry on their

---

7. In addition to the two no-fund checks and the trust fund, floor plan notes, see note 5, supra, were then past due and owing for approximately $3700 bringing the total past due indebtedness to about $6.000.

8. Harvester was given the express right of termination for cause:
   "(A) The Company may at its option
   "(1) terminate this agreement, effective at once, declare all indebtedness of the Dealer to it immediately due and payable and repossess all goods on hand for which the Dealer is indebted to it
   * * * * *
   "(3) * * * in the event of the happening of any of the following:
   "(1) The Dealer defaults in the payment of any obligation owing to the Company or to International Harvester Credit Corporation, or upon demand fails to account to the Company for the proceeds of the sale of goods for which he is indebted to the Company or to the International Harvester Credit Corporation."

operations. There is, first, of course, the security interest in having assurance that goods sold will be paid for. But it goes further than this, for the manufacturer's good will is inevitably bound up with local performance of those at the level where the product and the purchasing public meet. A manufacturer is entitled to believe that its good name, the trade acceptance of its wares, is jeopardized if a dealer's position is such that he has a demonstrated difficulty of paying bills and trade accounts. And it but magnifies the damage when, added to difficulty or delay in payment, bank checks are given under circumstances which indicate delivery with knowledge of insufficient funds.

On May 27, through the weekend, again on May 30 and 31, Harvester was urging the Dealer to make good on the three items which had business-moral overtones setting them apart from simple arrearages. This was to go the next mile. And this continuing indulgence and the inability of the Dealer to meet the fair terms could only affirm the earlier apprehensions responsible for bringing about the visits of May 17 and May 24—that the Dealer was absolutely unable to meet its obligations.

Nor can there be from this record any possible inference for jury decision that this unwillingness to pay was merely the result of oversight, bookkeeping error, or even negligent confusion by a Company able to pay. We can very well assume that the Sheen truck deal and the two checks started out in that way for these people were all well regarded business and professional persons. But once the fact of non-payment was acknowledged with repeated demands for payment, there was simply no cash.

A great clamor is made throughout the record and the briefs here that this was a growing and prosperous concern. Measured in terms of something other than simple accounting classification of increasing assets, it was something far from it. After pumping in an additional $14,000 capital from January to April 1955, the Dealer, which lost over $8,000 in its first year, was still showing substantial operating losses. With a slight profit of $1,812.92 for the two months of January and April 1955, the losses of $5,859.95 for February, March and May produced a net loss of $4,047.03 for the first, only and last five months of its 1955 operations.

It is true that the books showed an increase in assets and liabilities, but this process of "growth" was accompanied by a decline in resulting net worth.[9] In any case, so far as the Dealer's being able currently to meet and pay its obligations, the assets were largely illusory. And so they were if, as the Dealer claims, Harvester's actions prevented an orderly liquidation. For the net worth was primarily represented by items of unsupported valuation and having little liquidity.[10] Worse than that, the Company

---

9. These figures came from the Dealer's own auditor witness:

| As of Date 1955 | Assets | Liabilities | Net Worth |
|---|---|---|---|
| Jan. 31 | $ 85,077.19 | $ 66,287.50 | $17,772.94 |
| Febr. 28 | 94,571.54 | 76,467.76 | 17,087.03 |
| Mar. 31 | 110,151.09 | 94,563.31 | 14,571.03 |
| Apr. 30 | 118,333.52 | 101,244.15 | 15,539.56 |

10. Except for an equity of about $7,000 in floor plan merchandise, the stock was subject to floor plan indebtedness. Cash for current liabilities or for liquidation could come only from these items:

| | |
|---|---|
| Accounts receivable | $9,807.21 |
| Used Passenger Cars | 8,207.07 |
| Use Farm Equipment | 5,836.38 |
| Repair parts | 7,118.33 |
| Buildings | 904.65 |
| Machinery, tools & equipment | 5,438.10 |
| Office furniture & equipment | 1,887.17 |

There was no testimony showing the age of the items comprising accounts receivable, or the solvency of the debtors; but it is undisputed that McClaren, Jr. on the week end of May 27 sought unsuccessfully to raise the needed $3,000 from this source. Harvester's auditor witness was only able to account for $5,937.40

simply had no cash. Its cash balance as of April 30, 1955, was $924.77, but with a simultaneous bank overdraft of $564.03, the net cash position was $360.74. At that moment, note 9, supra, the liabilities were $101,244.15, so the ratio was about 1:300. In the last and critical month, matters only got worse. For on May 31, 1955, the bank balance was $6.68 against which there were checks outstanding[11] in the sum of $4,567.22.

Whether the Dealer was or was not solvent in either the business or bankruptcy sense, whether the net worth should or should not have included the $14,000 advance by McClaren-Batrous as a liability is of little moment. The fact overwhelmingly demonstrated by the Dealer's own books and records was of a business which was then badly in default with no real prospects of recovery short of an immediate transfusion of new capital. Since there were no donors on the horizon, Harvester was more than justified in terminating its entire relationship.

The moment it did this, it was entitled under the contract to repossess all of the floor plan merchandise. This was done by a Louisiana State Court sequestration proceeding filed June 7, 1955, by Harvester Credit Corporation. While the Dealer claimed that "the sequestration procedure completely eliminated what we had accumulated," it is significant that though the Dealer commenced this present case for damages on June 2, 1955, it made no defense whatsoever to the sequestration proceeding which resulted in a default decree by the Louisiana State Court.

█ This leaves then only the claim that Smart committed a trespass when he "stole" the keys and kept them from May 26 to June 1. Apparently proceeding on the idea that under Louisiana principles[12] which generally forbid self-help in the extrajudicial enforcement of installment conditional sales contracts, chattel mortgages or bills of sale, the Dealer attempts to make the act of Smart the tail by which to wag this $336,000 damage suit into one of liability.

There was, first, no element of a trespass as was true in the significant Louisiana cases, note 12, supra. The contracts gave Harvester the broadest rights for their representatives to visit the premises of the Dealers, take inventories, inspect books and generally ascertain the manner in which the Dealer was conducting his business. Moreover, the proof is uncontradicted that in today's business world of intense sales promotion, it was the common, frequent thing for one or more traveling representatives to be on the Dealer's premises, many times assisting in sales and other activities.

Smart, therefore, was entitled to be in and around the Dealer's premises during all of these times. He was never asked

---

as of May 31. The used passenger cars represented repossessions of Chrysler-Plymouth products which McClaren, Sr. had described as "a crippling blow." Likewise, there was no indicated market for the repair parts, the machinery tools and equipment, or the office furniture and fixtures whether valued, as some were, at cost, or otherwise.

11. Examination in 1957 by Harvester's auditor-witness of the Dealer's bank account records showed an overdraft as of May 23 of $3,453.63, $3,839.42 on May 25, and $4,560.54 on May 28. Some $941.91 in checks shown as drawn against the account were still on hand. The debit slips from the bank showed some of the overdraft items were as old as April 1955. No one testified for the Dealer to refute either the fact or the amount of these overdrafts.

12. The Dealer stresses: Strahan v. Simmons, La.App., 15 So.2d 164; Carter v. Mintz & Goldblum, La.App., 8 So.2d 709; Kirkwood v. Hickman, 223 Miss. 372, 78 So.2d 351, which discusses and relies upon the Louisiana cases of Van Wren v. Flynn, 34 La.Ann. 1158; Luthy v. Philip Werlein Co., Inc., 163 La. 752, 112 So. 709. To these may be added Price v. General Motors Acceptance Co., La. App., 95 So.2d 834; Grandeson v. International Harvester Credit Corp., 223 La. 504, 66 So.2d 317.

On this the Dealer attempts to build a case for vicarious punitive damages, Le Bleu v. Vacuum Oil Co., 15 La.App. 686, 132 So. 233; Harrison v. Petroleum Surveys, La.App., 80 So.2d 153.

to leave. Indeed, it was the dealer who invited more of them to come on May 27.

Using these keys in this way was not a repossession. It was done merely to assure that if a sale of one of the trucks was made, Harvester would receive out of the proceeds the amount of its floor plan note. With the Sheen truck deal such a recent event and the contemporary inability of the Dealer to make good the misapplied trust funds, this was Smart's way of obtaining the protection which the contract was intended to give. If, because the truck notes (or some of them) were not yet in default, and the contracts as a whole had not yet been terminated, Harvester did not then have the contract right to retake them as such, this action amounted at most to a breach of that contract, not a trespass. And to recover for the breach of contract, the Dealer would have to show, in money, the damages it sustained. Assuming that evidence of the two prospective purchasers who came there only to have McClaren, Jr. tell them he could not show them the trucks since these other people had the keys, was enough to demonstrate the loss of two prospective sales, the record is silent on translating that loss into dollars. What would have been the sales price? What size truck, indeed, was each interested in? Was it a cash or trade-in deal? What was the value of the trade-in? What was the wholesale cost of the truck? The margin of profit? What was the applicable overhead? What commissions were payable? None of these were answered. Moreover, as a simple breach of contract, the Dealer would have to show its efforts to mitigate the loss. The most obvious thing was to request that Smart unlock the trucks since it is undisputed that his stated purpose was merely to protect the company if the Dealer made a sale, and that, of course, envisaged that the Dealer could sell.

On no theory did the Dealer show good grounds for recovery. The action of the Court in directing a verdict was therefore proper.

Affirmed.