**TUPELO SPINDLE COMPANY, Inc.,**
**Plaintiff,**

v.

**ALLIS–CHALMERS MANUFACTURING**
**COMPANY, Defendant.**

**No. E–C–16–61.**

United States District Court
N. D. Mississippi, E. D.

Aug. 29, 1963.

William S. Lawson, Tupelo, Miss., Watkins, Pyle, Edwards & Ludlam, Jackson, Miss., for plaintiff.

W. P. Mitchell, Tupelo, Miss., for defendant.

CLAYTON, District Judge.

This is a suit by plaintiff, Tupelo Spindle Company, a Mississippi corporation, to rescind a contract made with the defendant, Allis-Chalmers Manufacturing Company, a foreign corporation, and to obtain by such recision certain patent rights assigned to defendant pursuant to said contract. Claim for such relief is bottomed principally on these positions advanced in the pleadings or in briefs by plaintiff:

a) Fraud on the part of Allis-Chalmers in the procurement of the contract;

b) Failure of Allis-Chalmers to give plaintiff a reasonable opportunity to adequately perform after acceptance of inferior performance over a long period of time;

c) Summary and arbitrary material breach of the contract by Allis-Chalmers;

d) Failure of consideration.

Trial was to the court. The hearing was lengthy, producing a transcript of more than sixteen hundred pages, and the briefs upon which the case was submitted are voluminous. In these circumstances, a rather full statement of the facts which are not in dispute and as determined from the evidence by the court is proper.

1) Allis-Chalmers is now and has been for many years a manufacturer of, among other things, a full line of farm

machinery and equipment. The president and sole stockholder of plaintiff, during a substantial part of the time with which we are concerned, is J. H. Gray, who was an employee of Allis-Chalmers from 1953 until 1960. During that time he worked principally as a "blockman" or factory service and sales representative, recruiting Allis-Chalmers dealers and working with dealers to assist them in selling Allis-Chalmers products and in the successful operation of their dealerships. He was a loyal, enthusiastic and effective employee, except as will be afterward mentioned.

2) A written condition of employment for all Allis-Chalmers employees is that any invention or improvement conceived by an employee would be the property of Allis-Chalmers. Gray understood that this was a condition of his employment with Allis-Chalmers. At least once, before the time with which we are concerned, he submitted one improvement to his company which was used by Allis-Chalmers.

3) Allis-Chalmers began to manufacture and market, about 1951, a mechanical cotton picker which had, as a critical part, a "spindle" (which is the part that comes into direct contact with the fibers of the open cotton boll) of a "fluted" type which was manufactured by Allis-Chalmers. Their pickers, equipped with this spindle, were not as efficient and reliable, under the varied conditions which are present in the geographically wide spread cotton growing territory, as were some pickers placed on the market by others, and, Allis-Chalmers did not meet with marked success in this field before 1958 or 1959.

4) The aforementioned situation was of continuing concern to Gray as a blockman for Allis-Chalmers. He was disappointed that his company was not in a pre-eminent position in the cotton picker market, and, he conceived the basic idea for a spindle of a different design, which he believed would be more efficient. In course of time, there was developed a rough model of the Gray conceived spindle which was submitted by

Gray to Allis-Chalmers in late 1956 under the aforesaid condition of his employment. He was advised by Allis-Chalmers in April of 1957 that they, at that time, were not interested in this device.

5) Plaintiff claims that W. L. Wood, who was a neighbor and friend of Gray, contributed materially to conceiving and developing the invention, but all the evidence compels the finding that the basic idea and its refinement to a patentable stage were Gray's and Gray's alone. But, in November, 1957, Gray undertook in writing to sell this invention to Wood, who furnished the capital to begin its manufacture on a small scale in 1958, in Tupelo, Mississippi, where both Wood and Gray lived. A concurrent oral provision of the "sale" by Gray to Wood of this invention was that if it succeeded, then one-half would belong to Gray. Applications for letters patent were made by Wood alone.

6) Operations began under the trade name of "Tupelo Spindle Company." The spindle which was manufactured was called the "Tupelo Recessed Barb Spindle." "Tulepo Spindle Company" manufactured and sold to the market about 485,000 spindles in 1958. Many of these were used to replace, in Allis-Chalmers pickers, the fluted type spindle aforementioned. Ostensibly to further the sales of Allis-Chalmers pickers and to soothe the feelings of owners who were not pleased with the performance of their Allis-Chalmers pickers, Gray, as an Allis-Chalmers blockman, assisted in promoting sales for the "Tupelo" spindle. He also arranged for the employment as full time sales manager by "Tupelo Spindle Company" of a blockman of Allis-Chalmers.

7) As a result of its appearance in the market and its success, Allis-Chalmers, in the fall of 1958, became interested in acquiring the patents for the Tupelo spindle. Their representatives conferred with Gray and advanced to him their claims to this spindle under the aforementioned condition of Gray's employment with Allis-Chalmers. At this time Gray told Allis-Chalmers, for the first

time, that Wood was involved. Following this, Gray, apparently acting for "Tupelo Spindle Company", but professing also to be acting in the best interests of Allis-Chalmers, made a written proposal to Allis-Chalmers which was in substance that "Tupelo Spindle Company", through 1960, would manufacture all Tupelo spindles required by Allis-Chalmers for new pickers and for conversion of older pickers, at 30¢ each; that "Tupelo Spindle Company" would quit selling spindles to anyone else and that Allis-Chalmers could take over prosecution of the application for patents with joint rights to belong to Allis-Chalmers, "Tupelo Spindle Company" and Gray after 1960, but exclusive rights to "Tupelo Spindle Company" until that time. This offer contemplated negotiations with respect to price between Allis-Chalmers and "Tupelo Spindle Company" for the continued manufacture of spindles for Allis-Chalmers at the end of the two year period. This proposal was voluntary on Gray's part and was not induced by Allis-Chalmers.

8) After the Gray proposal, Allis-Chalmers representatives came to Tupelo and conferred at length with Wood. A proposed draft agreement which was brought to Tupelo by the Allis-Chalmers representatives was used as a basis for discussion in these conferences. Gray sat in on all these conferences and took an active part in all discussions. He also took an active part in explaining to Wood some of the proposals which were discussed and in persuading Wood that such proposals would be to Wood's advantage. Basic general agreement on all matters under discussion was arrived at between Allis-Chalmers and Wood and notes were made as to each understanding. It was understood by all concerned that these agreements would be reduced to writing and executed by the parties at a later date. Leaving out some of the details with which we are not here concerned, the essence of the agreement was that:

a) "Tupelo Spindle Company" would manufacture for Allis-Chalmers all its requirements for Tupelo spindles at a price of 24¢ each for the years 1959 and 1960 and would sell spindles to no one else.

b) All applications for and rights to patents for this device would be assigned to Allis-Chalmers but Wood was to have a non-exclusive paid up license to manufacture this spindle device for the life of the patents which would be obtained.

c) Allis-Chalmers would reimburse Wood the total expense of the development of this device and all the expense in connection with his patent applications therefor.

d) After the first two year period, Allis-Chalmers might continue to buy spindles from Wood under certain conditions. It was the expressed wish of the parties on both sides of these negotiations that Wood and Allis-Chalmers would continue to do business after the first two year period.

9) About three weeks after these negotiations were concluded, a proposed contract was given to Wood for his examination and study and his execution if it was approved by him. Wood carefully reviewed the language of this proposed contract and discussed it in detail with Gray, who advised that it be signed as then drafted. Wood signed this contract and acknowledged his signature thereto and then returned it to Allis-Chalmers for execution. It was then properly executed for Allis-Chalmers. The contract was signed by Wood on the 25th day of November, 1958, but by its terms it was to be effective November 8, 1958. Some of the provisions of this executed document which are peculiarly pertinent to the controversy here are as follows:

"After December 31, 1960, Allis-Chalmers will continue to purchase its said requirements of Tupelo Spindles from Wood *so long as and to the extent that such purchases are to the advantage of Allis-Chalmers in the matter of price, quality, quantity and delivery schedules.*" (Emphasis added.)

"5. Allis-Chalmers shall furnish Wood with specifications and purchase orders stating the quantity, quality, type and delivery schedules of Tupelo Spindles to be purchased by Allis-Chalmers from Wood in accordance with Paragraph 4 hereof.

"Acceptance by Allis-Chalmers of said Tupelo Spindles from Wood will be contingent upon the ability of Wood to deliver to Allis-Chalmers the quantities scheduled in said purchase orders, said spindles to conform in all respects with said specifications therefor which in the first instance and until changed by Allis-Chalmers are Allis-Chalmers' drawings:" (then there are listed five drawings) "prints of which drawings are attached hereto as Exhibits A through E, respectively, and made part hereof."

This contract, as signed, is strikingly like the aforementioned original proposal made by Gray to Allis-Chalmers.

■ 10) The language of the original draft proposed agreement aforementioned, with respect to production of spindles by Wood for Allis-Chalmers is as follows:

"6. Allis-Chalmers *will negotiate in good faith* with Tupelo in an attempt to purchase from Tupelo its Dry Pick Spindles *so long as and to the extent that such purchases are to the advantage of Allis-Chalmers in the matter of competitive cost, price, quality, quantity and delivery schedules.*" (Emphasis added.)

Plaintiff in effect now contends that the foregoing specific language was agreed and should have been included in the contract. This contention has little merit since the evidence is that little, if any, specific language was agreed, and the contract as signed is clear and unambiguous and was understood by the parties at the time it was signed. Absent fraud, which will be dealt with later, parol evidence of negotiations can not be used to vary the terms of a resulting contract such as the one here. Perrault v. White Sewing Machine Co., 157 Miss. 167, 127 So. 271 (1930); Grenada Auto Co. v. Waldrop, 188 Miss. 468, 195 So. 491 (1940) and Chism v. Omlie, 239 Miss. 576, 124 So.2d 286 (1960).

It is also well to note that this original draft would not have required that Allis-Chalmers purchase all its requirements for these spindles from "Tupelo" for any period of time, or, that they purchase any spindles from "Tupelo" except as might be required by the above quoted provision thereof.

Significant also is that this draft would have allowed Allis-Chalmers to manufacture and sell these spindles, during the period ending December 31, 1960, if Tupelo could not satisfy Allis-Chalmers' requirements as set forth in its said Article 6.

11) After the execution of the contract in November, 1958, Allis-Chalmers paid Wood $6202.20 as the expense of development of this spindle device and the expense incurred in making patent applications therefor. And, "Tupelo Spindle Company" and Allis-Chalmers did business under this contract in 1959 and 1960. Chrome plating was added to the specifications in 1959 at an increase in price of three cents per spindle. All necessary documents were executed by Wood *and Gray* to place complete ownership of this device and the patent rights thereto in Allis-Chalmers. Late in 1959, while still working for Allis-Chalmers in its sales department, Gray acquired from Wood all of Wood's interest in "Tupelo Spindle Company". A corporate charter had been obtained earlier in 1959 and Gray, with the acquisition of Wood's interest, became the sole owner of all the stock thereof. Gray did not inform Allis-Chalmers of his ownership in Tupelo Spindle Company although he continued to work for Allis-Chalmers until August, 1960, when Allis-Chalmers learned of this ownership and he then resigned.

12) The Tupelo spindle was offered as alternate equipment for Allis-Chalmers pickers in 1959 and its success continued

to increase picker sales that year as the spindle had tended to do in 1958 when it was marketed by "Tupelo Spindle Company". There was little demand for the older fluted type spindle and Allis-Chalmers discontinued its manufacture after 1959. Approximately one million Tupelo spindles were sold to Allis-Chalmers in 1959. Many of these were shipped directly to Allis-Chalmers dealers and Allis-Chalmers had opportunity to inspect only those which were shipped directly to them, principally to their picker plant which was at Gadsden, Alabama. During that year there were deviations in specifications and a shipment of 30,000 spindles was rejected for this reason. Variations from specifications were pointed out to plaintiff in July, 1959, and some complaints were made that the spindles were not meeting specifications. Only 25,600 spindles were received at the Gadsden plant after August, 1959. And, Allis-Chalmers transferred to La Porte, Indiana, its picker manufacturing operations in the latter part of that year. Due to complaints from the field about the quality of spindles, the first shipment of about 63,000 spindles to La Porte was spot inspected and deviations from specifications were found. Plaintiff's vice-president and plant manager was advised of the situation and visited in La Porte, saw the rejects and admitted plaintiff had "goofed". He agreed with Allis-Chalmers that all the spindles at La Porte, as well as those in defendant's branches, would be inspected and sorted at plaintiff's expense and that plaintiff would accept a debit for all rejects. Inspection of 273,000 spindles revealed 21,800 rejects because of dimensional and other machining variations from specifications as well as for poorly applied chrome plating.

13) Follow up tests made early in 1960 by Allis-Chalmers showed that many of the spindles did not meet specifications for case depth or core hardness. Many were also found to be brittle. Plaintiff agreed to correct these faults and to heat treat the spindles to relieve the brittleness. Periodic tests conducted thereafter throughout 1960 showed that only a small part of the spindles met specifications for case depth or core hardness. Copies of the results of these tests were sent to plaintiff and plaintiff was periodically requested to advise Allis-Chalmers what was being done to correct this situation. Efforts were made by plaintiff to produce spindles according to specifications, but without marked success.

14) With the use of the Tupelo spindle, the sales of Allis-Chalmers pickers increased in 1960. This spindle provided an appreciable part of the lift which advanced a segment of Allis-Chalmers business, which, before the advent of this device in 1958, had not been too successful. Another factor which helped improve cotton picker sales generally was the decreasing supply of cheap farm labor for the hand picking of cotton.

15) Throughout 1959 and 1960, the system in effect between Allis-Chalmers and plaintiff was that a purchase order would be issued by Allis-Chalmers to plaintiff for the delivery to them by plaintiff on a date certain of a stated quantity of spindles. Complete specifications were included with each purchase order. *Each one of these orders was accepted by plaintiff without change.* But, in addition to the aforementioned habitual deviations from specifications, plaintiff, in 1960, failed completely to deliver spindles in the quantities specified on the dates specified. There were numerous appreciable delays in delivery for substantial quantities of spindles which disrupted and delayed the planned schedules for production and shipment of pickers by Allis-Chalmers and made their production more expensive. Throughout 1960 this situation was a continuing and serious concern to Allis-Chalmers and plaintiff was adequately and repeatedly advised thereof.

16) During the two years in which plaintiff's rights to manufacture all Tupelo spindles required by Allis-Chal-

mers was in full force and effect, Allis-Chalmers bought from plaintiff approximately two and one half million spindles for which they paid in excess of $650,-000.00. Under the terms of their contract, Allis-Chalmers could not obtain these spindles from any other source and plaintiff could not sell to anyone else. The pressing need for these spindles caused Allis-Chalmers to bear with the many variations from specifications and the notably poor delivery of these spindles. As the situation developed with no improvement of performance on the part of plaintiff, Allis-Chalmers began to study seriously the problem of what should be done at the end of the two year exclusive contract period. Cost studies were made for the production of this device which resulted in an estimate that Allis-Chalmers could produce them at a cost of 14.93¢ each, including factory burden. And, plaintiff was requested in June and again in July to give Allis-Chalmers a price proposal. This plaintiff was unable to do as late as August 1, 1960. These Allis-Chalmers studies were made in preparation for dealings with plaintiff and, alternatively, in preparation for production by Allis-Chalmers if it developed that the production portion of the contract with plaintiff was not extended. These studies included cost estimates for new machinery which would be needed if Allis-Chalmers was to manufacture their own spindles. No decision was made until after plaintiff at last proposed to Allis-Chalmers in early August, 1960, in discussions with them, to continue to produce these spindles for Allis-Chalmers at a price of 24¢ each using the same equipment plaintiff then had, or, at a price of 27¢ each if a new broaching machine *which would turn out a better quality product* was acquired by plaintiff. After these discussions and after plaintiff's proposal, Allis-Chalmers re-examined its aforementioned cost of production studies and determined them to be sound. They gave further consid-

eration to the problem and then notified plaintiff on August 16, 1960, that Allis-Chalmers would manufacture their own spindles after December 31, 1960. Plaintiff then offered to furnish these devices at a much lower price (which was substantially higher than the cost of production estimate aforementioned) but this offer was not accepted and Allis-Chalmers proceeded with preparations to begin manufacturing their own spindles. And, they have manufactured all their needs for these devices since January 1, 1961, at an early cost of about 19¢ each and a later cost of 13.3¢ each, according to the Works Manager at La Porte.

17) Plaintiff contends that Allis-Chalmers had no intention at the time of the execution of the contract in 1958, of purchasing any spindles under that contract after 1960, and that the execution of the contract was obtained largely because of a confidential relationship which existed between Gray and Allis-Chalmers on the one hand and Gray and Wood on the other (raised for the first time in briefs) which caused Gray in the first instance and Wood through him, to rely on deceitful representations made by Allis-Chalmers that they would continue to do business with "Tupelo Spindle Company" and buy spindles from Tupelo after 1960. Plaintiff also says that many things done by Allis-Chalmers, during the two years of the full operation of this contract, when considered together, cumulatively demonstrate the fraud of the Allis-Chalmers position at the time of the contract negotiations in November of 1958. Some of the things done by Allis-Chalmers during that period, about which plaintiff complains, will be dealt with first.

18) Plaintiff points with suspicion to the fact that Allis-Chalmers had prepared a cost of production estimate for the manufacture of this spindle before the contract negotiations in November of 1958.[1] The claim is that this was in-

1. This estimate was dated November 6, 1958, which was the day before contract negotiations started. It was that these spindles could be manufactured at a cost of 18.28¢ each.

dicative of an intent on the part of Allis-Chalmers at that time to manufacture the spindles themselves and not to buy spindles from "Tupelo Spindle Company" any longer than necessary to acquire the rights to the invention and the patents therefor. However, it would have been strange indeed for Allis-Chalmers to have undertaken negotiations for the purchase of any article to be manufactured by another company without informing themselves as much as possible with respect to efficient manufacturing costs which would be involved in manufacturing that article. A manufacturer who would not undertake such an elemental precautionary measure would not survive long in the modern market place.

19) Plaintiff contends that Allis-Chalmers deliberately failed to apprise plaintiff of their known needs for the year 1960 sufficiently far in advance to permit plaintiff to furnish spindles in the quantities ordered on the dates specified. The record shows that plaintiff was informed in the latter part of October, 1959, of a minimum requirement of one million spindles and was then offered a letter of intent to that effect if necessary. Plaintiff was further informed on November 18, 1959, that the requirement for spindles for 1960 would be approximately 1,-250,000. Authorizations were not resolved by Allis-Chalmers until late November, 1959, since their production of cotton pickers was being moved from Gadsden, Alabama, to La Porte, Indiana. Plaintiff complains that purchase orders which were placed with Tupelo about December 15, 1959, for delivery of 1,240,-000 spindles within 90 days were placed with the knowledge that plaintiff did not have capacity to produce such a quantity in so short a time. However, the record shows that purchase orders were placed on December 15 and December 17, 1959, for 1,202,600 spindles; that 62,600 were spindles that had already been prepared for shipment to the Alabama plant but were shipped to La Porte, Indiana, instead. These orders, for the remaining spindles, provided for delivery of 425,000

in 90 days and the remainder in intervals of 120 and 150 days. Plaintiff's plant superintendent did not express any concern over the ability of his company to produce 1,250,000 spindles when this was discussed with him in November, 1959, and plaintiff never at any time made complaint about delivery dates, but, on the contrary, acknowledged and accepted each purchase order upon the basis of the delivery date shown thereon. No request for any change in these delivery dates was ever made.

20) Plaintiff also contends that defendant changed specifications and blueprints nineteen times during the first 90 days of 1960 and that this action on the part of Allis-Chalmers made it impossible for plaintiff to meet the delivery schedules. Since plaintiff does not point out which of these changes caused delay, it is proper to discuss all of them. The record conclusively shows that sixteen of these changes fell into one of these categories:

a) To make of record practices which were already being followed, or

b) To express the same dimension or the same permissible tolerance in a different way, or

c) To increase a permissible tolerance so as to make compliance with specifications easier for plaintiff, or

d) To change a dimension, a tolerance, or other requirement to conform to the capabilities of equipment and machinery being used by plaintiff and thus make compliance with specifications easier for plaintiff.

Plaintiff's witness who was in charge of production for plaintiff during the times with which we are here concerned fully conceded that none of these sixteen changes caused any production difficulties at all. In fact, most of these sixteen changes were helpful to plaintiff.

With respect to the other three changes, one of them established for the first

time a longitudinal dimension for the grooves on these spindles and posed no production problem of any consequence. It did cause rearrangement of vises. One provided for heat treatment to overcome brittleness in the spindles (which has already been mentioned) and the one other change established with certainty a groove width of %4 to ⅛. This last change was fully discussed with plaintiff's plant superintendent and it was accepted by him as a tolerance which could be met by plaintiff with the equipment then being used to manufacture these spindles. All these were made authoritatively definite to plaintiff in time for compliance therewith, although formal changes were issued later. Plaintiff never made any complaint with respect to any specification or changes thereto and never requested any change in any delivery date because of specification changes *or for any other reason.*

21) Plaintiff contends that the fact that Allis-Chalmers leased to plaintiff certain equipment for plaintiff's use in spindle manufacture and required in the lease contract that this equipment be returned to Allis-Chalmers not later than December 31, 1960, indicates that Allis-Chalmers then had no intention of purchasing any of its spindle requirements from plaintiff after 1960. Plaintiff also says that a part of this equipment (the oven for heat treating the spindles) was in a worn-out, dilapidated condition which required about six weeks for plaintiff to get it in operation, with the intention of delaying plaintiff in meeting the delivery dates then scheduled. These contentions, however, overlook the fact that the oven had been in continuous use by Allis-Chalmers until a very short time before its delivery to plaintiff and it also overlooks the fact that Allis-Chalmers was bound to continue purchasing spindles from plaintiff only if it was to the advantage of Allis-Chalmers with respect to cost, quantity and delivery schedules after December 31, 1960; and, that until these questions were resolved, it would have been improvident for Allis-Chal-

mers to tie up with plaintiff any of its equipment longer than the exclusive two year period of the contract. *This contention also overlooks the fact that plaintiff's plant superintendent initiated the request to obtain the use of all this equipment with which he was familiar, and that he personally inspected all of the equipment before leasing it.* Allis-Chalmers was in no way obligated, and was never requested by plaintiff, to furnish any installation assistance or operating instructions for any of this machinery. Plaintiff paid the stipulated rental upon all of said equipment throughout the term of the lease without complaint or objection and even apologized for an oversight in the failure to pay on time the rental for the months of April and May, 1960. It is well also to note that the rental required by Allis-Chalmers for this equipment was much lower than customary in industry. All of this equipment, including the oven, has been and was at the time of the trial in use by Allis-Chalmers, except one machine which was not needed in their operation.

22) Complaint is made of defendant's cost analysis of June, 1960, which has heretofore been mentioned, as being indicative of an intent not to buy spindles from Tupelo after 1960. However, without such preliminary planning and cost of production estimates (which are standard practice in industry) defendant could not have known whether it was to its advantage to continue to purchase from plaintiff or to manufacture their own spindles. Sinister overtones are also ascribed to the fact that Allis-Chalmers officials obtained preliminary authorization from their Board of Directors for money required to provide machinery and equipment with which to manufacture spindles, if the decision was made so to do. It would have been unwise for Allis-Chalmers to approach the end of the exclusive period of this contract without intensive study and preliminary preparations in order to make a valid determination as to whether it would be to their advantage to continue to pur-

chase spindles from plaintiff or to manufacture their own spindles. The preliminary approval of the appropriation was not a decision to manufacture the spindle, but was a permissive procedure entirely contingent upon the price at which these spindles could be purchased from plaintiff after December 31, 1960.

23) Complaint is also made that Allis-Chalmers commenced negotiations with a machine tools manufacturer in April, 1960, for the manufacture of a broaching machine to be used in the manufacture of spindles by Allis-Chalmers. These were not negotiations for the purchase of such a machine, but were preliminary cost estimates in connection with the cost of production study aforementioned. Such studies are continually made by Allis-Chalmers on many items (and by all other efficient manufacturers as well) with the idea of improving the product and for the purpose of determining the cost on every item which is bought so they may be in position to determine whether they should make or buy such item.

24) Plaintiff charges that Allis-Chalmers accepted delivery of the aforementioned broaching machine about the first day of November, 1960, and that spindles were manufactured on it in November, 1960. There is no evidence that this was done. The record shows that specifications of this machine were not in final form so that a formal purchase order could be placed until September 28, 1960. The evidence also shows that this machine was not delivered to defendant until the latter part of March, 1961, and that very few of the 1961 requirements of spindles were produced on this machine. If, in fact, Allis-Chalmers had the purpose ascribed by plaintiff in 1958, or even in 1959 or early 1960, to manufacture their own spindles after 1960, it is obvious that they would have tooled up to do this long before March, 1961.

25) Plaintiff also contends that Allis-Chalmers manufactured a quantity of spindles before December 31, 1960. Allis-Chalmers did manufacture a small quantity of spindles for experimental purposes in August, 1960, and these were placed in field test machines in September, 1960. These were *of a new material and were for testing only.* Allis-Chalmers did begin making spindles only (not completed assemblies) in October, 1960, in preparation for their production needs of 1961, but no completed assemblies were manufactured for marketing purposes until April, 1961.

26) Plaintiff also claims that only 28 days after Allis-Chalmers notified Tupelo on August 16, 1960, that it would no longer purchase spindles from them, defendant issued a purchase order to plaintiff for 250,000 additional spindles with a thirty day delivery date. However, this overlooks the fact that plaintiff's plant superintendent advised Allis-Chalmers that plaintiff had some spindles on hand and material and could supply these spindles if Allis-Chalmers needed them. The additional 250,000 spindles were needed by Allis-Chalmers for production of its cotton pickers which was to begin in January, 1961, (a much earlier time than had theretofore been used) and since the plant superintendent assured Allis-Chalmers that the spindles could be delivered in thirty days time, the order was issued and accepted. No complaint of any sort was made by plaintiff with respect to the specified delivery date. The date of this purchase order was September 13, 1960. A shipment under it of 100,000 spindles was received by Allis-Chalmers in La Porte on October 19, 1960, and a routine spot check revealed some defective spindles. This was reported to the Works Manager and he directed that a sample of 200 be taken from each crate of 5,000 spindles and that a written report be submitted on the condition of the spindles. While this inspection was under way, another shipment of 100,000 spindles was received in late October and these were also inspected. Report of this inspection was written on November 9, 1960, and received by the Works Manager about November 13. Plaintiff's

plant manager went to La Porte on November 17 and was shown samples of the defective spindles. He conceded that they were defective and requested that they all be returned to Tupelo for sorting. These spindles were rejected and returned to plaintiff. Plaintiff asserts that this was done because of surface finish only, although no surface finish was specified, but the record shows that these rejections were largely because an excessive number of spindles had cracked rollers or plating build ups which made it impossible to assemble the bushing over the spindle, or pointed barbs and uneven land widths and plating that was peeling off.

27) Following the aforementioned rejection, plaintiff accepted a replacement purchase order for 250,000 spindles on November 25, 1960, for delivery as soon as possible with full knowledge that all of the aforementioned leased equipment had already been returned to Allis-Chalmers. In a shipment of 70,000 on this order, 6600 were rejected as not meeting specification, and this order was cancelled.

█ 28) Raising the question for the first time in its briefs that there was a confidential relationship between Gray and Allis-Chalmers on the one hand and between Gray and Wood on the other, plaintiff asserts that Allis-Chalmers had the burden of showing that the negotiations leading to the execution of the contract of November, 1958, were free from fraud. The evidence does not support this position. Gray was a sales employee of Allis-Chalmers and repeatedly said to the defendant's representatives who were negotiating with Wood, that he, Gray, had no interest in the matter and that they would have to deal with Wood and Wood alone. Even if Gray had great confidence in these Allis-Chalmers employees (some of whom he scarcely knew) and relied upon what they said *he was not a party to the contract* which was signed.

Neither was there any such confidential relationship between Gray and Wood, at the time of the contract negotiations, as would make dealings between them suspect, insofar as the subject matter of this suit and the rights of Allis-Chalmers are concerned. Wood, according to Gray, had loaned Gray $500 with which to develop the idea of the spindle, which was conceived by Gray. Gray says that Wood contributed materially to the development of this device, but Wood does not so claim. After Gray undertook to sell this invention to Wood, then Wood did furnish some capital with which production of this spindle was started in 1958. At that time Gray says he had no interest in the invention, unless it should succeed when he would have a one-half interest therein.

After the contract was executed in November, 1958, (which Gray as principal stockholder and president of plaintiff now seeks to rescind) Gray reacquired Wood's entire interest in the invention and in "Tupelo Spindle Company". Gray thus effectively brought to an end whatever rights (if any) Wood might have had to complain about the contract or the actions of Allis-Chalmers thereunder. And, Gray then stepped in to Wood's position.

If Gray overreached or overpersuaded and thus defrauded Wood, he (Gray) cannot now complain since he has succeeded to Wood's position under the contract. The effect of plaintiff's position is to say that Gray (Allis-Chalmers) defrauded Gray (Tupelo) and that, therefore, he, Gray, should succeed in this suit against Allis-Chalmers. This just will not do.

29) From what has thus far been said it is apparent that the evidence does not support findings that the confidential relationships contended for by plaintiff, as they might affect the signing of the contract, in fact existed in November 1958. Nor does the evidence meet the clear and convincing test required to show that Allis-Chalmers had no intention, at the time of signing the contract, of buying spindles under this contract after 1960.

It was plaintiff's burden to prove existence of such a confidential relationship

between Gray and Allis-Chalmers and such a confidential relationship between Gray and Wood, as would affect the execution of the contract, before any burden would attach to Allis-Chalmers to show that their acts, with respect thereto were free from fraud. This plaintiff has not done. Cresswell v. Cresswell, 164 Miss. 871, 140 So. 521, 144 So. 41, 43 (1932); Wall et al. v. Wall et ux., 177 Miss. 743, 171 So. 675, 677 (1939); 37 C.J.S. Fraud § 95, p. 402.

It was even a greater burden for plaintiff to show by clear and convincing evidence that Allis-Chalmers had the claimed deceitful and fraudulent intention in November 1958, not to buy spindles under this contract after 1960. The foregoing findings demonstrate that plaintiff also fell short of the mark in this respect. Newport Industries v. Crosby Naval Stores (5 Cir., 1944) 139 F.2d 611; Broadhead v. Enochs (S.D.Miss., 1958) 162 F.Supp. 897; Otts Finance Co. v. Myers, 169 Miss. 407, 152 So. 834 (1934); Jones v. Minton, Miss., 141 So.2d 564 (1962); 37 C.J.S. Fraud § 94, pp. 393–401.

30) In addition to the claims of fraud plaintiff also contends that Allis-Chalmers committed a material breach of the contract, which entitled plaintiff to recision, when the decision was made not to purchase spindles from plaintiff after 1960. Assuming for the moment that recision might be the proper remedy, if a material breach of the contract is shown, the cases cited by plaintiff dealing with contracts which are to be performed to the satisfaction of one of the parties and applying the rule that satisfaction must be determined by reasonableness and good faith, have little force here. This contract does not say that purchases after 1960, would be made so long as they were to the satisfaction of Allis-Chalmers. This contract provides that such purchases would continue to be made after 1960 *"so long as and to the extent that such purchases are to the advantage of Allis-Chalmers in the matter of price, quality, quantity and delivery schedules"*. Thus, it seems immaterial whether plaintiff's spindles were satisfactory or not, "based upon the objective standard of reasonableness" since if it was not to the advantage of Allis-Chalmers in *all four of the particulars* specified in the contract, then Allis-Chalmers was not required to buy spindles from plaintiff after 1960.

To be able to complain in this regard, of the decision not to purchase spindles from plaintiff after 1960, plaintiff would have to show that this decision was arbitrarily or capriciously made. Best Motor & Implement Co. v. International Harvester Co. (5 Cir., 1958) 252 F.2d 278, 284; Fidelity National Bank & Trust Co. v. Southern United Ice Co. (8 Cir., 1935), 78 F.2d 438, 440. The evidence would not justify such a finding, or, one that plaintiff's performance met the "objective standard of reasonableness" contended for by plaintiff.

Plaintiff's principal argument is directed to quality alone. It is, in effect, that since these spindles were successful in the field and since the users made little material complaint, then Allis-Chalmers was bound to continue purchasing from plaintiff after 1960. Plaintiff does not (and in fact could not) seriously contend that it was to the advantage of Allis-Chalmers to purchase spindles after 1960 with respect to quantity or with respect to delivery schedules. Reducing this argument to its essence plaintiff contends that if the spindles were satisfactory to the customers of Allis-Chalmers then Allis-Chalmers was required to continue to purchase spindles from plaintiff after 1960, in spite of higher price, plaintiff's limited capacity to produce in quantity and plaintiff's poor ability to deliver on schedule. This argument must fail when the evidence in this record is measured by any acceptable standard.

31) Plaintiff also contends that Allis-Chalmers accepted inferior standards of performance over a long period of time; that reasonable notice and opportunity for adequate performance was

not given to plaintiff and, that, therefore, Allis-Chalmers had no right to decide against purchasing spindles from plaintiff after 1960. Cases are cited dealing with situations where one party summarily terminated a contract, before the end of the period within which both parties were obligated unconditionally by the contract to perform, after long acceptance of inferior performance without complaint during that period. This is not the case here. Inferior standards of performance were accepted by Allis-Chalmers during the entire two year exclusive period of this contract. But, after that two year period Allis-Chalmers was obligated to continue purchasing spindles from plaintiff only if it was to defendant's advantage to do so on the basis of price, quality, quantity and delivery schedules. And, as has been said the evidence does not show that it was to the advantage of Allis-Chalmers in all, or even in any of these particulars to rely on plaintiff to supply spindles to it after 1960.

Even if the rule relied on by plaintiff could be said to apply to the factual situation here, before plaintiff could gain solace therefrom the evidence would have to show that inferior performance was accepted by Allis-Chalmers without complaint or objection. And, this record is replete with instances where Allis-Chalmers did in fact object and complain to plaintiff about its performance during the two year exclusive period of this contract.

32) Plaintiff plead but did not brief a claim that there was a failure of consideration, and that, therefore, the contract should be rescinded. However, payment of more than $6,000 to Wood by Allis-Chalmers at the time the contract was signed; the granting to Wood (and thus to plaintiff) of a paid up license to manufacture this device for the life of the patents and the purchase and payment for more than $650,000 worth of merchandise by Allis-Chalmers under this contract make manifest that there is no merit to this contention. Ogle v. Durley et al., 223 Miss. 32, 77 So.2d 688, 693 (1955); 17 C.J.S. Contracts, § 127.

33) In summary, when all the evidence is considered, it appears that plaintiff probably brought about its own downfall, insofar as furnishing spindles to Allis-Chalmers after 1960 is concerned. The success of this spindle in the field in 1958, when it was manufactured with no specifications, and its continued success in the field after the contract seemingly led plaintiff to the assumption that this was all that was required of it as to quality under its contract. And, plaintiff never developed an adequate system of quality control. Plaintiff's lack of a sound understanding of the necessity for careful and reliable scheduling for its assembly lines by Allis-Chalmers caused plaintiff to have little appreciation for the importance of specified delivery dates for spindles. Plaintiff's limited industrial skills and limited industrial experience caused plaintiff to fail to recognize the inadequacy of the fixturing for the machines it was using and the fact that at least some of these machines were probably too light. These also caused plaintiff to fail to appreciate the need for the habitual use of measuring, gauging and checking instruments and devices, which should have been routine in this type operation, as a part of a sound quality control system. This situation also led plaintiff repeatedly to overestimate its production capabilities and its ability to mass produce spindles according to contract specifications. Also the fact that two of plaintiff's key men (its president and its plant superintendent) were former employees of Allis-Chalmers may have caused plaintiff to believe that poor performance on its part would be forgiven or overlooked when Allis-Chalmers came to consider whether it would continue to buy these spindles from plaintiff or make them after 1960.

34) The evidence does not show any actionable fault on the part of Allis-Chalmers or that plaintiff is entitled to any relief.

Order is being entered in accordance with this opinion.